MARIE D. BOUCHARD, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 59888. Filed June 30, 1960.

*Kenneth W. Bergen, Esq.*, for the petitioner.
*Manning K. Leiter, Esq.*, for the respondent.

WITHEY, *Judge:* The Commissioner has determined a deficiency of $25,449.44 in the petitioner's income tax for the taxable year

ended July 31, 1952. The issue presented is whether the respondent erred in determining that the petitioner acquired by gift from her deceased husband certain corporate stocks sold or exchanged by petitioner during the taxable year and that petitioner's basis for computing gain on such stocks was the basis of the stocks to her husband as provided in section 113(a)(2) of the Internal Revenue Code of 1939, instead of determining that the petitioner acquired the stocks under the terms of the will of her husband and that petitioner's basis for computing gain on the stocks was their fair market value at the time of the death of her husband as provided in section 113(a)(5) of the Code and used by her in her income tax return.

FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

At all times material herein and until December 4, 1951, the date of his death, Euclide J. Bouchard, sometimes hereinafter referred to as the decedent, and the petitioner were husband and wife and resided in Caribou, Maine. The petitioner was the sole executrix of the estate of the decedent and she filed with the director of the district of Maine a Federal income tax return for herself, individually, and as executrix of the estate of the decedent for the taxable year ended July 31, 1952.

The decedent died testate, leaving a will executed on October 18, 1940. By his will the decedent made token bequests of $1 to each of his five children and gave the residue of his estate to the petitioner.

Prior to April 13, 1950, the decedent maintained a margin account with Elmer H. Bright & Co., sometimes hereinafter referred to as Bright Company, stockbrokers, with offices in Boston, Massachusetts. The account stood in the decedent's name as sole owner, however the certificates for the stocks in the account were in street names and their location at any time involved herein is not disclosed by the record.

The decedent became concerned about the state of his health and was desirous of making an arrangement whereby the securities in the account with Bright Company would be readily available to the petitioner in the event of his death. Accordingly, on March 16, 1950, the decedent wrote a letter to Bright Company which contained the following:

> In the event of my death it is my wish that my wife, Marie D. Bouchard, shall immediately become the sole owner of all my stock with full power to execute any deal including sales and transfers of any stock which I may own at time of death. All to be executed by her signature, and in such event this is your authority to accept her instructions in the disposal of any part of, or

all of my account as she may wish with all returns made payable to her or whomever she may designate.

If there are any particular papers you desire pertaining to this matter please send necessary forms which I will be glad to execute and you may please send me immediately acknowledgment of this letter.

Pursuant to advice given decedent by a representative of Bright Company that creation of a joint account in the names of the decedent and petitioner would provide the arrangement desired by decedent, the decedent and petitioner on April 11, 1950, signed a standard joint margin account agreement addressed to Bright Company which contained the following:

Gentlemen:

In consideration of your carrying a joint account for the undersigned, the undersigned jointly and severally agree that each of them shall have authority on behalf of the joint account to buy, sell and otherwise deal in, through you as brokers, stocks, bonds and other securities and commodities, on margin or otherwise (including short sales); to receive on behalf of the joint account demands, notices, confirmations, reports, statements of account, and communications of every kind; to receive on behalf of the joint account money, securities and property of every kind, and to dispose of same; to make on behalf of the joint account agreements relating to any of the foregoing matters, and to terminate or modify same or waive any of the provisions thereof; and generally to deal with you on behalf of the joint account as fully and completely as if he alone were interested in said account, all without notice to the other or others interested in said account. The authority hereby conferred shall remain in force until written notice of its revocation addressed to you is delivered at your office * * *

The undersigned further agree jointly and severally that all property you may at any time be holding or carrying for any one or more of the undersigned shall be subject to a lien in your favor for the discharge of the obligations of the joint account to you, such lien to be in addition to and not in substitution of the rights and remedies you otherwise would have.

It is further agreed that in the event of the death of either or any of the undersigned, the survivor or survivors shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such proceeding, require such papers, retain such portion of and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. The estate of any of the undersigned who shall have died shall be liable, and each survivor shall continue liable, to you for any net debit balance or loss in said account in any way resulting from the completion of transactions initiated prior to the receipt by you of the written notice of the death of the decedent or incurred in the liquidation of the account or the adjustment of the interests of the respective parties.

(a) In the event of the death of either or any of the undersigned, the entire interest in the joint account shall be vested in the survivor or survivors on the same terms and conditions as theretofore held.

*     *     *     *     *     *     *

Subject to the provisions hereof, all notices or communications for the undersigned in respect of the joint account are to be directed to

Name EUCLIDE J. BOUCHARD

Address 7 *Vaughan St., Caribou, Maine*

On the same day the petitioner signed a margin agreement with Bright Company.

Pursuant to the joint margin account agreement, the decedent on April 13, 1950, transferred all the securities then in his margin account into a joint margin account in the names of "Euclide J. Bouchard or Marie D. Bouchard, either or survivor, and not as tenants in common."

Petitioner was a housewife and did not take an interest in and did not participate in the business affairs of the decedent. She had confidence in him and signed without question all documents he presented to her for her signature. She was not acquainted with the details of holding securities and was not interested in such details.

As part of the transfer of the securities from the account in his name alone to the joint margin account and in order to avoid additional brokerage commissions, the decedent paid off a balance of $10,323 due on amounts which the firm had previously lent him to make up the difference between the cost of the securities in the account and what he had put up as margin. When the joint margin account was established and the securities transferred to it, the firm returned the $10,323 by a check dated April 14, 1950, payable to "Euclide J. Bouchard and Marie D. Bouchard." This check was endorsed by the decedent and also by the petitioner.

Thereafter the decedent continued to deal with the joint margin account in the same manner as he had dealt with the account he previously had in his name alone. He consulted with the brokerage firm about the securities to be bought for the account, he authorized all purchases and sales of those securities, and on several occasions he withdrew funds from the account. The checks received from the firm were made payable to the joint owners, but the decedent would endorse his and petitioner's names on the checks and deposit them in a checking account with the Aroostook Trust Company of Caribou, Maine.

The foregoing checking account was in the names of Euclide J. Bouchard or Marie D. Bouchard, payable to either or survivor. The decedent deposited his salary and other of his funds in the account and kept in his possession a checkbook used for drawing checks on the account. The petitioner drew checks on the account to pay household expenses using blank checks which decedent gave her and which she signed "Euclide J. Bouchard per M. D. Bouchard." However, petitioner regarded the account as belonging to the decedent. There was another account with the same bank which stood in the names of Marie D. Bouchard or Euclide J. Bouchard, either or survivor, which was considered by petitioner as her account. Deposits

in this account represented sums given by the decedent to petitioner and profits from transactions in potato futures which decedent conducted in petitioner's name. Petitioner used the account to make various personal expenditures.

Petitioner and decedent also had a joint safe-deposit box at the Aroostook Trust Company.

As a result of the creation of the joint margin account with Bright Company and of sales and purchases in the name of the account from April 13, 1950, until the death of the decedent on December 4, 1951, there stood in the names of "Euclide J. Bouchard or Marie D. Bouchard, either or survivor, and not as tenants in common," on December 4, 1951, the following shares of corporate stocks which had the indicated adjusted bases to decedent for Federal income tax purposes, which had the indicated fair market values on December 4, 1951, and which were sold by the petitioner on the indicated dates:

| Number of shares | Corporation | Adjusted basis to decedent | Fair market value on Dec. 4, 1951 | Date sold |
|---|---|---|---|---|
| 100 | American Woolen | $4,292.76 | $3,712.50 | Jan. 9, 1952 |
| 100 | Erie Railroad | 2,233.56 | 1,962.50 | Jan. 9, 1952 |
| 100 | North American Aviation | 1,128.06 | 1,650.00 | Jan. 23, 1952 |
| 100 | Fairchild Engine | 511.82 | 700.00 | Jan. 23, 1952 |
| 100 | Calumet & Hecla | 1,040.13 | 887.50 | Jan. 23, 1952 |
| 100 | Virginia Carolina Chemical | 1,354.19 | 2,175.00 | Jan. 23, 1952 |
| 100 | St. Regis Paper | 1,743.63 | 1,687.50 | Jan. 23, 1952 |
| 100 | Garrett Corporation | 2,095.38 | 2,325.00 | May 11, 1952 |
| 120 | United Aircraft | 2,925.14 | 3,690.00 | May 12, 1952 |
| 100 | American Airlines | 926.63 | 1,575.00 | May 16, 1952 |
| 104 | White Motors | 2,798.88 | 2,975.00 | May 16, 1952 |
| 150 | Bigelow Sanford | 3,414.44 | 2,662.50 | May 16, 1952 |
| 100 | Canadian Pacific | 2,786.31 | 3,150.00 | May 16, 1952 |
| | Total | 27,250.93 | 29,152.50 | |

The Bouchard Potato Company, Inc., sometimes hereinafter referred to as Potato Company, was organized under the laws of Maine on August 27, 1934. Its officers were J. Edward Bouchard, brother of decedent, president and treasurer, and decedent, vice president and secretary. The directors were decedent, J. Edward, and his wife Esther. The petitioner was never a director of the company, and at no time prior to decedent's death participated in the conduct of the company's affairs.

As of August 24, 1951, the outstanding capital stock of Potato Company was held as follows:

*Shares*

| | |
|---|---|
| Euclide J. Bouchard | 229 |
| J. Edward Bouchard | 229 |
| Marie D. Bouchard | 1 |
| Esther Bouchard | 1 |

The Potato Company maintained a safe which was located in the company's office. The decedent used a compartment in the safe for keeping his personal papers. The compartment was not used for

any other purpose. The key to the compartment, along with other keys, was kept in a box in the safe. In addition to the decedent and his secretary having access to the safe, Kenneth Bouchard and Dolores Bouchard, son and daughter, respectively, of decedent and petitioner, had access to it. The stock certificates standing in the names of petitioner and the decedent were kept in the above-mentioned compartment of the safe. At no time material herein did the petitioner seek access to the safe or to its contents.

The Potato Company never paid any dividends.

During the summer of 1951 the decedent continued to be concerned about his health. He suffered from heart trouble and worried considerably about his business. On or prior to August 24, 1951, he conferred with his attorney, stating that he was contemplating a transfer of his stock in Potato Company to petitioner and himself as joint tenants in order to insure that the stock would pass promptly to her upon his death. The attorney advised him that such action would constitute a gift to petitioner with respect to the stock and was unnecessary because the stock would go to petitioner under the terms of his will. Despite the advice of his attorney, the decedent, on August 24, 1951, at the annual meeting of the shareholders of the company, which also was attended by J. Edward Bouchard and Esther Bouchard, announced that he was going to change his stock certificates so as to make the petitioner a joint tenant. J. Edward Bouchard advised the decedent against such action on the ground that it was unnecessary because the petitioner would receive the stock under the decedent's will. The decedent persisted and, because decedent and he had always acted together in matters relating to the company, J. Edward Bouchard agreed to do the same for his wife with respect to the shares standing in his name. Accordingly, all the outstanding stock of the company was surrendered and canceled. New certificates for 230 shares were issued on August 24, 1951, in the names of "Euclide J. Bouchard and Marie D. Bouchard as joint tenants with right of survivorship and not as tenants in common." New certificates for 230 shares also were issued in the names of J. Edward and Esther Bouchard as joint tenants with right of survivorship and not as tenants in common.

Federal documentary stamps were affixed to the new certificates, and those issued in the names of petitioner and the decedent were placed in the above-mentioned compartment in the company safe where they were at the time of decedent's death.

Petitioner did not attend any shareholders meetings of Potato Company, including the one held on August 24, 1951, and the decedent was not in the habit of discussing his business affairs with her.

In September 1951, Potato Company borrowed $25,000 from a bank in Providence, Rhode Island. In connection with this loan the decedent gave a personal financial statement to the bank in which he included the value of the securities in the joint margin account with Bright Company and the value of one-half of the stock in Potato Company. He did not indicate on the statement that the margin account and the stock so listed were jointly owned by petitioner and himself.

No meetings of the stockholders of Potato Company were held after that of August 24, 1951, and prior to decedent's death on December 4, 1951. Following the decedent's death and as of January 2, 1952, the company was liquidated. However, the certificates for stock in the company were never surrendered or canceled. On liquidation of the company the petitioner received with respect to the 230 shares of stock which the decedent on August 24, 1951, had registered on the books of the company in the names of "Euclide J. Bouchard and Marie D. Bouchard as joint tenants with right of survivorship and not as tenants in common," assets having a fair market value of $132,600.52. The fair market value of the 230 shares of stock in the company on December 4, 1951, as well as at the time of liquidation of the company, was $132,600.52. The adjusted basis to the decedent of such shares on August 24, 1951, for Federal income tax purposes was $32,380.

The inventory of the decedent's estate which was sworn to by petitioner on May 6, 1952, and thereafter filed with the Register of Probate, Houlton, Maine, did not show either the above-mentioned 230 shares of stock in Potato Company or any of the stocks in the joint margin account with Bright Company as property of the estate, nor did the inventory contain any reference to the stock in Potato Company, or to the joint margin account, or to any of the stocks in that account.

In the Federal estate tax and Maine inheritance tax returns, the corporate stocks involved herein were included at their fair market values on the date of the decedent's death, and estate and inheritance taxes were paid on this basis. In the Federal estate tax return the stocks were reported as jointly owned property.

No gift tax returns were filed with respect to the joint margin account or the joint tenancy in the stock of Potato Company.

On some undisclosed date following liquidation of Potato Company, petitioner, as owner, began the conduct of a business known as Bouchard Potato Company, employing two of her sons, her daughter, and the decedent's secretary at the time of his death to operate the business for her.

In the Federal income tax return filed by petitioner for herself, individually, and as executrix of the estate of the decedent for the

taxable year ended July 31, 1952, the petitioner reported the sale of the corporate stocks in the joint margin account at the time of the decedent's death and, in computing the gain or loss reported therefrom, used as the bases of the stocks their fair market values at the time of the decedent's death, December 4, 1951. No mention was made in the return of the stock in Potato Company or of the liquidation of the company or of the petitioner's receipt of assets of the company upon the latter's liquidation.

In determining the deficiency here involved, the respondent determined that the stocks in the margin account and the 230 shares of stock in Potato Company which on August 24, 1951, the decedent had registered on the books of the company in his and the petitioner's names were the subject of gifts by the decedent to petitioner prior to the death of the decedent and that the basis for determining gain on the sale or exchange of the stocks during the taxable year was the cost of the stocks to the decedent as provided in section 113(a)(2) of the 1939 Code.

OPINION.

The petitioner contends that the record not only shows that the decedent during his lifetime did not make a gift to her of any interest in the joint margin account with Bright Company or in the stock of Bouchard Potato Company, Inc., but further shows that she acquired the stocks in the margin account and the stock in Potato Company as beneficiary under the decedent's will. Accordingly, she contends that her basis for computing gain on the sale or exchange of the stock in Potato Company and the stocks in the margin account was their fair market values on the date of the decedent's death, December 4, 1951, as provided in section 113(a)(5) of the 1939 Code and not the basis to the decedent as provided in section 113(a)(2) of the Code. Pertinent portions of section 113 are set out below.[1]

The evidence shows that in 1940 the petitioner executed a will in which he made token bequests of $1 to each of his five children and gave the residue of his estate to the petitioner. By the spring of 1950, or less than 2 years prior to his death, the decedent was not

[1] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be cost of such property; except that—

(2) GIFTS AFTER DECEMBER 31, 1920.—If the property was acquired by gift after December 31, 1920, the basis shall be the same as it would be in the hands of the donor or the last preceding owner by whom it was not acquired by gift, * * *

(5) PROPERTY TRANSMITTED AT DEATH.—If the property was acquired by bequest, devise, or inheritance, or by the decedent's estate from the decedent, the basis shall be the fair market value of such property at the time of such acquisition. * * *

well. He was aware of his condition and was concerned about it. He desired to provide for the petitioner in a more definite and specific manner than he had provided by his will. He desired to set up an arrangement whereby that portion of his property represented by his margin account with Bright Company would be readily available to petitioner in the event of his death and without the delay and uncertainty which would result from subjecting such property to probate and administration proceedings of his estate. Pursuant to advice given decedent by a representative of Bright Company, the decedent and petitioner on April 11, 1950, executed a standard joint margin account agreement providing for the creation of a joint margin account with Bright Company which was set up in the names of "Euclide J. Bouchard or Marie D. Bouchard, either or survivor, and not as tenants in common." A few days later the decedent transferred to the joint margin account all of the stocks then in his margin account with Bright Company.

There is no indication in the record that it was contemplated by decedent and petitioner at the time they executed the joint margin account agreement or at any time afterwards that the petitioner should or would transfer any property to the account. Nor is there any indication that she ever transferred any property to the account. Under the terms of the joint margin account agreement, petitioner was given—

authority on behalf of the joint account to buy, sell and otherwise deal in, through you [Bright Company] as brokers, stocks, bonds and other securities and commodities, on margin or otherwise (including short sales) ; * * * to receive on behalf of the joint account money, securities and property of every kind, and to dispose of same; * * * and generally to deal with you [Bright Company] on behalf of the joint account as fully and completely as if he [she] alone were interested in said account, all without notice to the other or others interested in said account. * * *

Furthermore, the joint margin account agreement provided that—

In the event of the death of either or any of the undersigned [decedent and petitioner], the entire interest in the joint account shall be vested in the survivor or survivors on the same terms and conditions as theretofore held.

The petitioner was not acquainted with the details of holding securities and was not interested in such details. Consequently, following the creation of the joint margin account and until his death, the decedent conducted all dealings with Bright Company respecting the account. Checks issued by Bright Company with respect to the account were drawn payable to the joint owners, decedent and petitioner. The first check received from Bright Company was endorsed by both petitioner and the decedent. Subsequent checks were endorsed by decedent by signing both his and the petitioner's names

and were deposited by him in a joint checking account in his and petitioner's names. The petitioner not only has failed to inform us as to the amount of gains and income arising from the joint margin account from its creation until decedent's death, but also has failed to show that she did not actually receive or otherwise benefit from a sum equivalent to the amount of such gains and income during that period.

In the probate and the administration of the decedent's estate of which the petitioner was executrix, the stocks in the joint margin account were not included and administered as assets of the estate. Instead, the petitioner in January 1952 began selling the stocks in that account and by the middle of May 1952 had completed the sale of all the stocks in the account. She received and retained all the proceeds of sale of the stocks. Thus the desire of the decedent in the spring of 1950 with respect to the joint margin account and the stocks therein was fully and completely effectuated.

In *Adolph Weil*, 31 B.T.A. 899, affd. 82 F. 2d 561, certiorari denied 299 U.S. 552, we stated (at page 906) that the essential elements of a bona fide gift inter vivos are as follows:

(1) a donor competent to make the gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift, *in praesenti*; (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; (5) a delivery by the donor to the donee of the subject of the gift or of the most effectual means of commanding the dominion of it; (6) acceptance of the gift by the donee; *Edson v. Lucas*, 40 Fed. (2d) 398, and authorities there cited. Cf. *Allen-West Commission Co. v. Grumbles* (C.C.A., 8th Cir.), 129 Fed. 287; *Edwin J. Marshall*, 19 B.T.A. 1260; affd. (C.C.A., 6th Cir.), 57 Fed. (2d) 663, certiorari denied 282 U.S. 61.

There can be no serious question that the first two of the above-mentioned elements of a gift were present. Respecting the presence of the third, fourth, and fifth elements, we think the holding in *Tracy* v. *Commissioner*, 70 F. 2d 93, reversing 25 B.T.A. 1055, is applicable. In that case Tracy prior to January 1, 1925, had a marginal stock trading account in his name with a certain broker. In the latter part of 1924 he discussed with his wife, Helen, the advisability of making the account a joint account in the names of both of them and she agreed to such action. On or about January 1, 1925, Tracy wrote the broker a letter which was received in due course and which contained the following:

Please make a joint account of my transactions with your firm in the name of W. R. and Helen Tracy, effective January 1, 1925.

Orders for transactions in this account will be given to you for the writer.

Tracy informed Helen of his directions to the broker and she acquiesced. It was Tracy's view that Helen could trade in and draw upon the account and it was also her understanding that she might trade in it and that the account would be hers in the event of Tracy's death. It was the practice of the broker in handling joint accounts to permit either party to trade in the account and to draw on the account independently of the other and to withdraw dividends from excess funds if the account was properly margined and the broker would have permitted either party to have done this after receipt of the letter. During 1925 and 1926 Tracy did all of the trading in the account.

For 1925 and 1926 Tracy and Helen filed separate income tax returns, reporting the income and deductions growing out of the account as though each had a half interest therein. The respondent determined that the stocks represented by the account were all owned by Tracy, that all dividends and gains derived therefrom were reportable in his return, and that he alone was entitled to deduct the full amount of interest paid and losses sustained. We sustained the respondent's determination on the ground that the evidence failed to establish a valid gift in that it failed to show an intention on the part of Tracy to absolutely and irrevocably divest himself of title, dominion, and control of the subject of the gift *in praesenti* at the time he undertook to make it, so that he could exercise no further dominion or control over it.

In reversing our holding the Court of Appeals said:

While certificates of stock are usually transferred by indorsement thereof to the purchaser or the donee, or by indorsement in blank and delivery with change of ownership recorded upon the books of the corporation, it must be borne in mind that what Tracy endeavored to give to his wife was an undivided interest, not in specific shares of stock, but in an open and continuing trading account. Concededly there was no delivery of any shares of stock, and there could be none. Tracy had no certificates to assign and deliver, and it is doubtful if his broker had them—certainly none that were earmarked for Tracy. All the donor had was a right to certain balances in the event that the account was closed, and in any event no more than a right to claim delivery of a certain number of shares from those in the possession of the broker at the time, or to be thereafter purchased by him. Manual delivery is not a condition indispensable to the completion of a gift. Smith v. Commissioner of Internal Revenue (C.C.A. 7) 59 F. (2d) 533. It is clear that Tracy made such delivery as the subject-matter of the gift permitted. * * * Tracy did all that was necessary for him to do, and the facts as found permit of no inference other than that the transfer was recognized by the broker. * * *

But, even were we to adopt the interpretation put upon Tracy's letter by the Board, the respondent would have no better case. It is not unusual for a husband to have the sole management of a business or joint adventure engaged in by him and his wife, so that his greater business experience shall the more likely contribute to its success. * * *

The decision of the Court of Appeals in the *Tracy* case was cited with approval in *M. W. Smith, Jr.*, 3 T.C. 894, and *Edward H. Heller*, 41 B.T.A. 1020. We will no longer follow our decision in *William R. Tracy*, 25 B.T.A. 1055.

In view of the fact that the petitioner herein was a party to the joint margin account agreement which conferred on her the broad authority to deal with the joint margin account as fully and completely as if she alone were interested in it and vested in her upon the death of the decedent the entire interest in the account and in view of the further fact that following decedent's death she sold all the stocks in the account and received the proceeds therefrom, we think it must be concluded that in April 1950 she accepted from the decedent a gift of at least a joint interest in the account with the right to acquire the entire interest therein upon her survival of the decedent.

In view of what has been said above we think the petitioner's contention that the decedent during his lifetime did not make a gift to her of any interest in the margin account must be denied and that the respondent's determination that petitioner acquired the stocks in the joint margin account as a gift from the decedent must be sustained.

During the summer of 1951 the decedent continued to be concerned about his health. He suffered from heart trouble and worried considerably about his business. He again desired to make an additional provision for the petitioner which was more specific than he had made by his will. Of the 460 shares of outstanding stock of Potato Company, 229 of them were held by decedent and 1 share by petitioner. The remainder was held in a like proportion by decedent's brother and his wife. Contrary to the advice of his attorney and of his brother, the decedent on August 24, 1951, or approximately 3 months prior to his death, caused the certificates for the shares held in the names of himself and petitioner to be surrendered and canceled and certificates to be issued for 230 shares in the names of "Euclide J. Bouchard and Marie D. Bouchard as joint tenants with right of survivorship and not as tenants in common." The certificates so issued remained unchanged at the time of the decedent's death. Following decedent's death the Potato Company was liquidated as of January 2, 1952. With respect to the stock in question, the petitioner received in liquidation assets having a fair market value in excess of $132,000. The inventory of the decedent's estate which was sworn to by petitioner and filed in the probate proceedings of the estate, did not show or contain any reference to either the stock or the assets received by petitioner with respect thereto.

The respondent urges that under the provisions of section 42 of chapter 168 of the Revised Statutes of Maine (1954) which became effective August 20, 1951, a joint tenancy between the decedent and the petitioner in the stock here involved was created by decedent on August 24, 1951, by causing the stock to be transferred into the names of himself and petitioner as joint tenants with right of survivorship and not as tenants in common. Pertinent portions of the Revised Statutes of Maine are set out below.[2]

The petitioner contends that the purpose of the Maine statute relied on by respondent was merely to remove the common law bar to a joint tenancy in situations where one person conveys to himself and another or other persons as joint tenants, a bar which the Maine courts had consistently upheld, and not for the purpose of abolishing all of the common law prerequisites of a valid inter vivos gift where a point interest in stock is given.

Section 42 of chapter 168 of the statutes in question provides that—

Certificates of stock in corporations, corporate bonds, corporate debentures and other corporate securities, * * * record title to which is held in the name of 2 or more persons as joint tenants or under language indicating the intention that said property be held with the right of survivorship, shall be deemed to be held in an estate in joint tenancy with all the attributes and incidents of estates in joint tenancy created or existing at common law, and shall be deemed to be so held even though said property may have been transferred directly by a person to himself jointly with another or other persons.

---

[2] Revised Statutes of Maine, ch. 168:

Sec. 42. Joint tenancies in corporate securities.—Certificates of stock in corporations, corporate bonds, corporate debentures and other corporate securities, not including shares in building and loan associations, record title to which is held in the name of 2 or more persons as joint tenants or under language indicating the intention that said property be held with the right of survivorship, shall be deemed to be held in an estate in joint tenancy with all the attributes and incidents of estates in joint tenancy created or existing at common law, and shall be deemed to be so held even though said property may have been transferred directly by a person to himself jointly with another or other persons. (1951, c. 51.)

Sec. 43. Not retroactive unless agreement filed.—Section 42 shall not apply to any such transfer made prior to August 20, 1951, unless the persons in whose names said securities have been issued or are held, file with the corporation issuing such securities or with its transfer agent or registrar an agreement indicating their intention that section 42 shall apply. (1951, c. 51, 1953, c. 308, § 108.)

Sec. 44. Form of agreement.—The following shall be a sufficient agreement to secure the application of section 42:

"We ――――, ――――, and ――――, owners of ―――― shares of common (preferred) stock of ―――― company represented by certificate No. ――――, owners of bonds No. ――――, Series ―――― of ―――― company, owners of ―――― debentures No. ――――, Series ―――― of ―――― company, owners of a certain promissory note dated ――――, etc., signed by ―――― company, owners of .(describe any other security) ―――― issued by company hereby agree that our ownership in the above-mentioned property shall be as joint tenants with rights of survivorship as such, and not as tenants in common, in accordance with the provisions of sections 42 and 43 of chapter 168 of the revised statutes of Maine." (1951, c. 51.)

Sec. 45. Existing valid joint tenancies not affected.—Nothing in sections 42, 43 and 44 shall be construed so as to affect the validity of any joint tenancy otherwise validly created. (1951, c. 51.)

Considering the provisions of section 42 in connection with the following sections 43 through 45, we are of the opinion that section 42 effectively removed the common law bar to the creation of a joint tenancy in corporate securities, other than shares in building and loan associations, where one person conveys to himself and another or other persons. Further construction is unnecessary here.

Respecting the question of decedent's intention to make a gift of a joint interest in the stock and of a delivery of the stock to petitioner, there is testimony which attributes to the decedent certain statements to the effect that he did not intend to give the decedent the stock and the petitioner testified that decedent never informed her as to his action in causing the certificates to be issued in his and her names on August 24, 1951, and that he never delivered the certificates of stock to her and that she, even at the time of the trial herein, had never seen the certificates and that she had never made any effort to see them. The petitioner was not acquainted with the details of holding securities and was not interested in such details and decedent knew it. The petitioner testified that the decedent kept all his papers at his office at the Potato Company. The attorney who advised the decedent against the transfer was not only professionally acquainted with the decedent but was socially acquainted with him and with the petitioner. He also was attorney for petitioner in the administration of the decedent's estate and in that capacity learned that decedent had transferred the stock contrary to his advice. He testified that in the administration of the estate he gave no thought to the question as to whether a valid joint tenancy had been created in the stock as it made no difference because everything went to petitioner anyway and the estate was not prejudiced, the Government was not prejudiced, and no creditor was prejudiced.

The decedent made a transfer of the stock which as to form qualified as a joint tenancy under the statutes of Maine. The action of the decedent in making the transfer was an indication of his intent that petitioner should have an interest in the stock as a joint tenant with the right of survivorship. No change in the transfer was made by decedent prior to his death. Following the decedent's death petitioner treated the stock as having been acquired by her by reason of her survivorship of a joint tenancy. There is no showing that any creditor of the decedent or any other person contested the petitioner's treatment of the stock.

Petitioner further contends that under the Maine Statute of Wills inter vivos transfers of property with testamentary intent are void and that decedent's transfer of Potato Company stock being intended by him to be effective only upon the event of his death, such transfer is void.

We cannot agree. The transfer took place without benefit of the will for petitioner received assets of the Potato Company through its liquidation before any probate of the will. The primary effect of the Statute of Wills is the voiding of an inter vivos testamentary transfer as between an owner of property and the creditors of his estate. Such evidence as exists indicates there were no such creditors. The record does not show that either transfer of property here involved has ever been under attack by anyone other than petitioner who is the beneficiary thereof.

With respect to petitioner's contention that the involved transfers were made with testamentary intent we need only look to the facts to refute that contention. Decedent made the transfers in a form and manner which he had been advised would constitute gift transactions under Maine law. He did so even though he had strongly expressed to his attorney, who had so advised him, that he had no intent to make a gift *in praesenti*. He did so against the advice of his brother to the effect that his will would accomplish a transfer to take effect at death. We can only conclude from his acts that he intended a transfer *other* than one which would be effective only at his death. Indeed we are at a loss to understand how his clearly expressed intent that the property involved should be available to petitioner immediately upon his death without the necessity of probate of his estate could have been effectuated short of an inter vivos gift *in praesenti*.

In the circumstances present, we are of the opinion that in making the transfer of the stock on August 24, 1951, the decedent intended to give petitioner an interest therein as a joint tenant with right of survivorship and that the decedent's failure to manually deliver the certificates for the stock to the petitioner did not prevent the transfer from being a valid gift to petitioner. Accordingly, we conclude that the petitioner acquired the stock in question from the decedent by gift.

Having concluded that the petitioner acquired the stocks in the joint margin account and the stock in Potato Company as gifts from the decedent, we hold that her basis for computing gain or loss on such stocks was the basis of such stocks to the decedent as provided in section 113(a)(2) of the Code.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

Kern, *J.*, dissenting and concurring: With regard to the Potato Company stock, I am convinced that there was no intention on the part of Euclide to give to Marie *in praesenti* "the title, dominion,

and control of the subject matter of the gift" as a joint tenant. See *Adolph Weil*, 31 B.T.A. 899, 906, affd. 82 F. 2d 561. Considering the nature of the alleged gift and Euclide's status as Marie's husband, neither the failure of Euclide to make delivery of the stock to Marie nor his retention of some control over it would necessarily be fatal to the validity of the gift, if I could be satisfied from other circumstances that there was in reality an intent on the part of the donor to make a gift *in praesenti*. *Cf. Naomi Towle Bucholz*, 13 T.C. 201; *Hoxie* v. *Page*, 23 F. Supp. 905, affd. 104 F. 2d 918; *Tracy* v. *Commissioner*, 70 F. 2d 93. However, in this case we have uncontradicted testimony to the effect that Euclide did not intend to give to petitioner any such present joint interest in the Potato Company stock that she might enjoy and exercise jointly with him the incidents of ownership therein. This testimony is substantiated by these facts: This stock was in a small closely held corporation informally managed and controlled by Euclide and his brother; petitioner was never informed by Euclide that any interest in this stock had been given to her; the stock certificate, although issued in the joint names of Euclide and decedent, was kept in Euclide's office safe (to which petitioner had no access) rather than in the joint safe-deposit box of decedent and petitioner; decedent, as a practical matter, had the power to have this certificate canceled during his lifetime and another issued in his name by reason of his complete dominance over petitioner in all business matters; and decedent treated this stock as his own until his death. I think it is clear from the entire record that Euclide, by having a certificate for this stock issued in the joint names of himself and his wife, did not intend to give to her any present joint interest therein but merely intended to facilitate thereby her acquisition of the stock at the time of his death. Thus I would conclude that the issuance of this certificate in the joint names of Euclide and petitioner constituted in reality an attempt on Euclide's part to make a testamentary disposition thereof which would be invalid in Maine as contrary to the Statute of Wills. *Hill* v. *Hill*, 144 Maine 224, 67 A. 2d 533; *Barstow* v. *Tetlow*, 115 Maine 96, 97 Atl. 829; *Appeal of Garland*, 126 Maine 84, 136 Atl. 459; *Rose* v. *Osborne*, 133 Maine 497, 180 Atl. 315; *Reid* v. *Cromwell*, 134 Maine 186, 183 Atl. 758. Accordingly, in my opinion, the Potato Company stock passed to petitioner under the decedent's will and her basis is its fair market value as of the date of decedent's death.

The fact that the certificate was issued in the joint names of Euclide and petitioner is not a controlling factor. See *Sewell* v. *Commissioner*, 151 F. 2d 765, affirming a Memorandum Opinion of this Court.

With regard to the Maine statute relied upon by respondent it is my opinion that its purpose was merely to effect a change from the common law of Maine as stated in *Strout* v. *Burgess*, 144 Maine 263, 68 A. 2d 241 (which did not involve the question of a gift), so as to render it unnecessary in the future to use conveyances to and from a "straw man" in order to effect a valid joint tenancy in the original owner and another. In any event it should not preclude us from inquiring and determining whether in reality and for Federal tax purposes a bona fide gift *in praesenti* had been made. See *Lannan* v. *Kelm*, 221 F. 2d 725, 732; *Sewell* v. *United States*, 73 F. Supp. 957.

Therefore, as to the issue involving the Potato Company stock, I respectfully dissent from the majority opinion herein.

As to the issue involving the margin account, I concur in the result reached by the majority but on different reasoning.

While the primary purpose of the decedent in arranging for this margin account to be placed in the joint names of himself and petitioner was to facilitate its passage to her at his death, this transaction differs materially from his purported gift of the Potato Company stock to himself and his wife as joint tenants. Here the original margin account maintained in his own name was terminated and a new margin account was opened pursuant to a margin account agreement with the brokers, signed by both decedent and petitioner, which provided that each should have full power over the account and further provided that "[i]n the event of the death of either * * *, the entire interest in the joint account shall be vested in the survivor." Thus petitioner's interest in the margin account arose from a completed contract executed by and between the brokers, decedent, and petitioner.

The validity of this transaction is governed by the law of Massachusetts where the brokerage account was maintained. See *Strout* v. *Burgess*, *supra*. In order to prevail on this issue petitioner must show that under the law of Massachusetts the creation of the margin account in joint tenancy was in effect a gift by decedent to take effect only at his death and thus constituted an invalid testamentary disposition so that the assets of the account must be considered as passing to petitioner by his will rather than by the terms of the margin account agreement.

Petitioner has not shown that under the law of Massachusetts the margin account agreement constituted an invalid testamentary disposition of the assets of the account. To the contrary, it would seem to be valid and capable of passing the margin account assets to petitioner by its provisions. See *Chippendale* v. *North Adams*

*Savings Bank*, 222 Mass. 499, 111 N.E. 371; *Perry* v. *Leveroni*, 252 Mass. 390, 147 N.E. 826; and *Goldston* v. *Randolph*, 293 Mass. 253, 199 N.E. 896, 103 A.L.R. 1117. While these cases involve savings accounts with banks the principles stated therein would seem to be applicable to a case involving a margin account.

I would conclude that petitioner has failed to prove that the securities contained in the margin account passed to her by testamentary bequest rather than by an inter vivos transaction, and has therefore failed to prove that her basis as to these securities was other than that determined by respondent.